The Honorable Brian A. Tsuchida

UNITED STATES DISTRICT COURT FOR THE
WESTERN DISTRICT OF WASHINGTON
AT SEATTLE

UNITED STATES OF AMERICA,

Plaintiff,

v.

TRISTAN BRENNAND

Defendant.

NO.    MJ20-017

COMPLAINT FOR VIOLATION

Title 21, United States Code, Section 841(a)(1)

BEFORE the Honorable Brian A. Tsuchida, Chief United States Magistrate Judge, U.S. Courthouse, Seattle, Washington.

## COUNT 1

**(Possession of Methamphetamine with Intent to Distribute)**

On or about December 19, 2019, in King County, within the Western District of Washington, the defendant, TRISTAN BRENNAND, did knowingly and intentionally possess, with intent to distribute, methamphetamine, a Schedule II controlled substance under Title 21, United States Code, Section 812.

All in violation of Title 21, United States Code, Sections 841(a)(1) and 841(b)(1)(C).

COMPLAINT/BRENNAND - 1
USAO #2019R01079

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

The Complaint is based on the following information:

I, Ernest McGeachy, having been first duly sworn on oath, hereby depose and state as follows:

### INTRODUCTION

1.     I am a Special Agent (SA) with the U.S. Department of Homeland Security, Immigration and Customs Enforcement (ICE), Homeland Security Investigations (HSI), assigned to the Special Agent in Charge (SAC), Seattle, Washington.  I have been a special agent with HSI since October 2010.  HSI is responsible for enforcing the customs and immigration laws and federal criminal statutes of the United States.   As part of my duties, I investigate criminal violations relating to cybercrimes on the Dark Web, narcotics, and financial.  I have investigated and/or participated in many federal criminal investigations involving narcotics, financial and cybercrimes on the Dark Net.

2.     I am a graduate of the Federal Law Enforcement Training Center (FLETC) Basic Criminal Investigator Training Program, the Immigration and Customs Special Agent Training Program, and the Naval Criminal Investigative Service (NCIS) Special Agent Training Program.  Before joining HSI, I worked as a special agent with NCIS, and as a Customs and Border Protection officer. I hold a bachelor's degree in Political Science from Western Washington University.  I also hold a master's degree in Human Relations from the University of Oklahoma.  Additionally, I have attended HSI's Advanced Darknet and Cryptocurrency course.

3.     This affidavit is made in support of a complaint for the arrest of TRISTAN BRENNAND for violating Title 21, United States Code, Section 841(a)(1) (possession of methamphetamine with intent to distribute). Because this affidavit is submitted for that limited purpose, I am not including every fact known to me about this defendant or the larger investigation.

COMPLAINT/BRENNAND - 2
USAO #2019R01079

4.      The information in this affidavit is based upon the investigation I have conducted in this case, my conversations with other law enforcement officers who have engaged in various aspects of this investigation, and my review of reports written by other law enforcement officers involved in this investigation.

## BACKGROUND ON THE DARK WEB

5.      Based on my training, research, education, and experience, I am familiar with the following relevant terms and definitions.

6.      The "dark web" is a portion of the "Deep Web" of the Internet, where individuals must use anonymizing software or applications to access content and websites.  Within the dark web, criminal marketplaces operate, allowing individuals to buy and sell illegal items, such as drugs, firearms, and other hazardous materials, with greater anonymity than is possible on the traditional Internet (sometimes called the "clear web" or simply the "web").  These online market websites use a variety of technologies, including the Tor network (defined below) and other encryption technologies, to ensure that communications and transactions are shielded from interception and monitoring.  Famous dark web marketplaces, also called Hidden Services, such as Silk Road, operated similarly to clear web commercial websites such as Amazon and eBay, but offered illicit goods and services.  There are a number of marketplaces that have appeared on the dark web that have offered contraband for sale, including narcotics.  Users typically purchase narcotics through these marketplaces using virtual currency such as bitcoins.[1]

7.      "Vendors" are the dark web's sellers of goods and services, often of an illicit nature, and they do so through the creation and operation of "vendor accounts" on dark web marketplaces.  Customers, meanwhile, operate "customer accounts."  Vendor and customer accounts are not identified by numbers, but rather monikers or "handles,"

---

[1] Since Bitcoin is both a cryptocurrency and a protocol, capitalization differs.  Accepted practice is to use "Bitcoin" (singular with an uppercase letter B) to label the protocol, software, and community, and "bitcoin" (with a lowercase letter b) or "BTC" to label units of the cryptocurrency.  That practice is adopted here.

COMPLAINT/BRENNAND - 3
USAO #2019R01079

much like the username one would use on a clear web site.  If a moniker on a particular marketplace has not already been registered by another user, vendors and customers can use the same moniker across multiple marketplaces.  Based on customer reviews, vendors can become well known as "trusted" vendors.

8.      Pretty Good Privacy ("PGP") is used on dark web markets to encrypt communications between vendors and customers.   When a customer orders from a vendor or sends a vendor a message on a dark web market, that information may be stored in the marketplace's database.  The marketplace server may be hacked or seized by law enforcement, and a customer may not want their private messages with any sensitive information, like name and address, easily viewable by anyone who obtains access to the database.  These messages may also be seen by someone who has access to the vendor's computer or market account, such as a market administrator.  PGP encryption is used to solve this problem.

9.      A vendor has both a PGP private key and a public key.  A customer can use the vendor's public key to encrypt a message.  The vendor then uses their private key to decrypt the message.  Vendors keep their private key secure but not their public key, which they put on their profile.  This is done so customers may use a vendor's PGP public key to encrypt data sent to the vendor, such as the customer's name and address.  Only the corresponding PGP private key, held by the vendor, can decrypt the data.

10.      The Onion Router or "Tor" network is a special network of computers on the Internet, distributed around the world, that is designed to conceal the true Internet Protocol ("IP") addresses of the computers accessing the network, and thereby the locations and identities of the network's users.  Tor likewise enables websites to operate on the network in a way that conceals the true IP addresses of the computer servers hosting the websites, which are referred to as "hidden services" on the Tor network. Such "hidden services" operating on Tor have complex web addresses, which are many times generated by a computer algorithm, ending in ".onion" and can only be accessed

COMPLAINT/BRENNAND - 4
USAO #2019R01079

through specific web browser software designed to access the Tor network. Most "hidden services" are considered dark web services with no legitimate or identified service provider to which legal process may be served.

## BACKGROUND ON CRYPTOCURRENCY

11. Cryptocurrency, a type of virtual currency, is a decentralized, peer-to peer, network-based medium of value or exchange that may be used as a substitute for fiat currency to buy goods or services or exchanged for fiat currency or other cryptocurrencies. Cryptocurrency can exist digitally on the Internet, in an electronic storage device, or in cloud-based servers. Although not usually stored in any physical form, public and private keys (described below) used to transfer cryptocurrency from one person or place to another can be printed or written on a piece of paper or other tangible object. Cryptocurrency can be exchanged directly person to person, through a cryptocurrency exchange, or through other intermediaries. Generally, cryptocurrency is not issued by any government, bank, or company; it is instead generated and controlled through computer software operating on a decentralized peer-to-peer network. Most cryptocurrencies have a "blockchain," which is a distributed public ledger, run by the decentralized network, containing an immutable and historical record of every transaction. Cryptocurrency is not illegal in the United States.

12. Bitcoin is a type of cryptocurrency. Payments or transfers of value made with bitcoins are recorded in the Bitcoin blockchain and thus are not maintained by any single administrator or entity. As mentioned above, individuals can acquire bitcoins through exchanges (i.e., online companies which allow individuals to purchase or sell cryptocurrencies in exchange for fiat currencies or other cryptocurrencies), Bitcoin ATMs, or directly from other people. Individuals can also acquire cryptocurrencies by "mining." An individual can "mine" bitcoins by using his/her computing power to solve a complicated algorithm and verify and record payments on the blockchain. Individuals are rewarded for this task by receiving newly created units of a cryptocurrency.

COMPLAINT/BRENNAND - 5
USAO #2019R01079

Individuals can send and receive cryptocurrencies online using many types of electronic devices, including laptop computers and smart phones.

13. Even though the public addresses of those engaging in cryptocurrency transactions are recorded on a blockchain, the identities of the individuals or entities behind the public addresses are not recorded on these public ledgers. If, however, an individual or entity is linked to a public address, it may be possible to determine what transactions were conducted by that individual or entity. Bitcoin transactions are therefore sometimes described as "pseudonymous," meaning that they are partially anonymous. And while it is not completely anonymous, Bitcoin allows users to transfer funds more anonymously than would be possible through traditional banking and credit systems.

14. Cryptocurrency is stored in a virtual account called a wallet. Wallets are software programs that interface with blockchains and generate and/or store public and private keys used to send and receive cryptocurrency. A public key (or public address) is akin to a bank account number, and a private key (or private address) is akin to a Personal Identification Number ("PIN") number or password that allows a user the ability to access and transfer value associated with the public address or key. To conduct transactions on a blockchain, an individual must use the public key and the private key. A public address is represented as a case-sensitive string of letters and numbers. Each public address is controlled and/or accessed through the use of a unique corresponding private key—the cryptographic equivalent of a password or PIN—needed to access the address. Only the holder of an address's private key can authorize any transfers of cryptocurrency from that address to another cryptocurrency address.

15. Although cryptocurrencies such as Bitcoin have legitimate uses, cryptocurrency is also used by individuals and organizations for criminal purposes such as money laundering, and is an oft-used means of payment for illegal goods and services on hidden services websites operating on the Tor network. By maintaining multiple

COMPLAINT/BRENNAND - 6
USAO #2019R01079

wallets, those who use cryptocurrency for illicit purposes can attempt to thwart law enforcement's efforts to track purchases within the dark web marketplaces.

16.    Exchangers and users of cryptocurrencies store and transact their cryptocurrency in a number of ways, as wallet software can be housed in a variety of forms, including: on a tangible, external device ("hardware wallet"); downloaded on a Personal Computer ("PC") or laptop ("desktop wallet"); with an Internet-based cloud storage provider ("online wallet"); as a mobile application on a smartphone or tablet ("mobile wallet"); as printed public and private keys ("paper wallet"); and as an online account associated with a cryptocurrency exchange.  Because these desktop, mobile, and online wallets are electronic in nature, they are located on mobile devices (e.g., smart phones or tablets) or at websites that users can access via a computer, smart phone, or any device that can search the Internet.  Moreover, hardware wallets are located on some type of external or removable media device, such as a Universal Serial Bus ("USB") thumb drive or other commercially available device designed to store cryptocurrency (e.g. Trezor, Keepkey, or Nano Ledger).  In addition, paper wallets may contain an address and a QR code with the public and private key embedded in the code.   Paper wallet keys are not stored digitally.  Wallets can also be backed up into, for example, paper printouts, USB drives, or CDs, and accessed through a "recovery seed" (random words strung together in a phrase) or a complex password.  Additional security safeguards for cryptocurrency wallets can include two-factor authorization (such as a password and a phrase).

## STATEMENT OF PROBABLE CAUSE

17.    In June 2019, HSI Seattle received information from the Joint Criminal Opioid and Darknet (JCODE) Team—an FBI-led task force targeting illegal opioid distribution on the dark web—regarding a dark web vendor using a certain moniker (hereinafter the "Subject Moniker"). JCODE identified the Subject Moniker as an opioids trafficker based on his trafficking activities on "Empire Market," a dark web marketplace

COMPLAINT/BRENNAND - 7
USAO #2019R01079

where, among other things, illegal drugs are frequently traded. The Subject Moniker's profile on Empire Market indicated that he sold heroin, cocaine, and methamphetamine. The Subject Moniker also indicated that he accepted cryptocurrency in exchange for drugs, including bitcoin and Monero. There was no indication that the Subject Moniker was receiving other forms of payment.

18. Open source research conducted by JCODE around Empire Market and the dark web revealed the following:

a. The Subject Moniker had made 32 sales on Empire Market since April 2019 with 100% positive feedback.

b. The Subject Moniker's Empire Market vendor profile listed his operating hours and shipping times in Pacific Standard Time.

c. At least one dark web user identified the Subject Moniker as a heroin seller who shipped from "[N]orthwest US" on a popular dark web forum in May 2019.

d. The same dark web forum also had postings authored by a user whose name was identical to the Subject Moniker, in which the user discussed how to pack illegal drugs, purchase postage, store drugs and packaging materials, and track shipments.

e. The Subject Moniker used a messaging app called Wickr to communicate with his potential customers. The Subject Moniker's Wickr account was identical to the Subject Moniker.

19. On August 20, 2019, I analyzed the PGP public key the Subject Moniker used to communicate on Empire Market. The analysis revealed that the registrant of the Subject Moniker's PGP public key listed mozzy.phx@protonmail.com as his email address.

20. On August 28, 2019, an HSI undercover agent (hereinafter "UCA") visited the Subject Moniker's store on Empire Market. The Subject Moniker was advertising

COMPLAINT/BRENNAND - 8
USAO #2019R01079

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

"Pure #4 China White Uncut Heroin." The advertisement said: "This is 99% China White #4 Heroin straight from Sinaloa, no fentanyl or other bullshit cut here. You will not regret buying this product. It has a powdery, fluffy texture. OD's are potentially possible with opiate naïve individuals so PLEASE DO NOT ORDER THIS IF YOU CAN'T HANDLE STRONG HEROIN/OPIATES. We recommend starting with doses not greater than 5-10 mg for total beginners." The Subject Moniker offered 3.5 grams of "China White" heroin for $345.00 and USPS Priority Mail shipping for $8.

21.     On the same day, the UCA ordered 3.5 grams of "China White" heroin from the Subject Moniker's store on Empire Market and paid 0.03648636 Bitcoin (BTC), which was, at the time, worth approximately $353 U.S. dollars ($345 for heroin plus $8 for shipping). The UCA then sent the shipping instruction to the Subject Moniker through a message encrypted with Subject Moniker's PGP public key.

22.     On August 28, 2019, the UCA visited Empire Market again and checked the order status on the Subject Moniker's store. The status showed that the order had been shipped via USPS Priority Mail on August 30, 2019.

23.     On September 4, 2019, HSI Yakima received a parcel at the undercover address provided to the Subject Moniker for the "China White" heroin order. HSI Yakima forwarded the parcel to HSI Seattle via FedEx.

24.     On September 5, 2019, HSI Seattle investigators received the parcel from HSI Yakima and opened it. The parcel contained a white envelope. Inside the white envelope was a black DVD case. The DVD case, in turn, contained multiple layers of packaging. After removing the multiple layers of packaging, the investigators recovered a zip-lock baggie with a hard rock and powdery white substance. The substance, which weighed approximately 3.94 grams with packaging, field-tested positive for heroin.

25.     On September 6, 2019, HSI Seattle investigators visited the Subject Moniker's store on Empire Market again. The Subject Moniker's profile page listed the following information under the "About" section:

COMPLAINT/BRENNAND - 9
USAO #2019R01079

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

a.    "9/4 – Meth is back in stock (for now, it's going very quick so place an order ASAP if you want any), and China White is currently out of stock. China should be in stock early next week, don't message me when it's coming back. I'll post here when it's in stock."

b.    "9/1 – SUPER LOW prices for bulk 70% cocaine right now, not going to be in stock for long!"

c.    "8/16 – 90% Pure Cocaine, and Social 70% Pure Cocaine have been added. The 90% is honestly the purest cocaine you will ever do hands down. It's pricey because there's nothing that compares to it, it's very intense if you're just a casual snorter. The Social Cocaine is preferred by a lot of customers because it's very smooth and isn't intense and still an excellent high while also being more affordable."

26.    An HSI analyst conducted open source research on historic dark web vendors in an attempt to identify the Subject Moniker and located information regarding Tristan BRENNAND. In 2015, HSI Seattle and U.S. Postal Inspection Service (USPIS) investigated and arrested BRENNAND for distributing MDMA on the dark web. BRENNAND was subsequently prosecuted in this District and sentenced to 48 months in prison and three years supervised release. He is currently on supervised release in this District.

27.    Open-source research revealed that BRENNAND served his federal sentence at FCI Phoenix. In addition, a commercial database often utilized by law enforcement showed that BRENNAND was associated with 8445 N 23rd Ave, Apt 133, Phoenix, AZ 85021 between June and July 2017. Notably, the ".phx" in "mozzy.phx" is a commonly used abbreviation for Phoenix, AZ.

28.    Independently from HSI's research, in October 2019 the USPIS identified records related to suspicious outgoing parcels from the Bitter Lake Post Office in Seattle, WA. This record review was done as part of the USPIS's routine inspection to detect any suspicious mailing patterns. According to the records, on September 20, 2019,

COMPLAINT/BRENNAND - 10
USAO #2019R01079

approximately 57 Priority and Express Mail parcels were mailed with a listed sender of "Realtime CD and DVD Duplication." Significantly, the parcel HSI received from the Subject Moniker on September 4, 2019 contained a DVD case with heroin inside. The listed sender for the September 4 parcel from the Subject Moniker was "Sparrow Media and Gift."

29.     On October 23, 2019, the USPIS, at the request of HSI Seattle, researched BRENNAND's name on USPS databases. The USPIS discovered that BRENNAND had an online U.S. Postal Service business account, and the user name for that account was "mozzy.phx."

30.     The USPIS recovered surveillance video footage from the Bitter Lake Post Office taken on September 20, 2019, the day that the individual dropped off approximately 57 suspicious Priority Mail parcels. The video footage showed a white male entering the Bitter Lake Post Office carrying a box full of parcels at approximately 8:39 a.m. The white male removed the parcels from a box and placed some onto the retail counter and the rest into a plastic tub near a postal clerk. The physical and facial features of the white male closely resembled those of BRENNAND as depicted and described in his Washington State Department of Licensing profile. The video footage further showed the male leaving the Bitter Lake Post Office in a black BMW with blacked-out-rims and no frontal license plate.

31.     On October 31, 2019, the USPIS researched the federal court database and saw that a piece of mail addressed to BRENNAND and relating to his supervised release was mailed to 3718 204th ST SW, APT H101, Lynnwood, WA 98036 (hereinafter the "SUBJECT PREMISES") in September 2019. This mail was delivered to and accepted at the residence.

32.     On the same date, the USPIS conducted surveillance around the SUBJECT PREMISES. A black BMW 535 with blacked-out-rims and no frontal license plate, but with a rear Washington license plate BQA3429 (hereinafter the "SUBJECT VEHICLE")

COMPLAINT/BRENNAND - 11
USAO #2019R01079

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

was parked in a space outside of building H and in close proximity to the hallway leading to apartment H101.

33.     A search of the National Law Enforcement Telecommunications System (NLETS) revealed that the SUBJECT VEHICLE was registered to a Washington company called "Sundance Media Agency." A search of the Washington State Department of Revenue database revealed that BRENNAND was listed as the governing person for the company.

34.     On December 4, 2019, in this District, a GPS tracking warrant was issued for the SUBJECT VEHICLE for 45 days. On December 5, 2019, HSI and United States Postal Service, Office of Inspector General (USPS-OIG), installed the GPS tracker on the SUBJECT VEHICLE.

35.     On December 15, 2019, investigators placed an undercover order for 56 grams of methamphetamine from the Subject Moniker's store on Empire Market. The payment was made in bitcoin.  Investigators instructed the Subject Moniker to send the narcotics to an undercover address controlled by law enforcement in Montana.

36.     On December 17, 2019, an HSI undercover agent placed an undercover order for 56 grams of methamphetamine from the Subject Moniker on Empire Market. The payment was made in bitcoin.  The undercover agent instructed the Subject Moniker to send the narcotics to an undercover address controlled by law enforcement in Washington.

37.     On December 18, 2019, investigators from HSI, FBI, and USPIS conducted surveillance around the SUBJECT PREMISES. At approximately 11:45 a.m., I observed a white male matching the physical description of BRENNAND entering the SUBJECT VEHICLE that was parked in a parking stall near the SUBJECT PREMISES. The SUBJECT VEHICLE departed from the area and drove southbound on I-5. The agents lost visual of the SUBJECT VEHICLE, but was later able to locate the SUBJECT VEHICLE parked near an office space located at 1455 NW Leary Way, Suite 400 (Office

COMPLAINT/BRENNAND - 12
USAO #2019R01079

409), Seattle, WA 98107 (hereinafter the "SUBJECT OFFICE") based on information from the GPS tracker.

38.    At approximately 4:39 p.m., one of the investigators observed the same white male matching the physical description of BRENNAND exit from the building in which the SUBJECT OFFICE was located. The male was carrying white envelopes that were consistent in appearance with the U.S. Priority Mail parcel received by the HSI Yakima on September 4, 2019, and the U.S. Priority Mail parcels that had been dropped off at the Bitter Lake Post Office on September 20, 2019. The male placed the white envelops in the trunk of the SUBEJCT VEHICLE, smoked or vaped near the vehicle, and subsequently departed at approximately 4:47 p.m.  Investigators followed the SUBJECT VEHICLE but lost visual.

39.    The HSI subsequently obtained records from Regus, a company that managed the building in which the SUBJECT OFFICE was located, on January 3, 2020. The records showed that BRENNAND had been occupying the SUBJECT OFFICE since July 2019 under the company name T. BRENNAND, Inc. The Office Agreement was signed by BRENNAND on July 12, 2019.

40.    On December 19, 2019, investigators placed an undercover purchase for a half ounce of methamphetamine from the Subject Moniker's store on Empire Market. The payment was made in bitcoin. Investigators instructed the Subject Moniker to send the methamphetamine to an undercover address controlled by law enforcement in Pennsylvania.

41.    On December 20, 2019, investigators from HSI, FBI, and USPIS conducted surveillance near the SUBJECT PREMISES. At approximately 8:47 a.m., I observed a white male matching the physical description of BRENNAND walking to the SUBJECT VEHICLE, which was parked near the intersection of 38th Ave W and 204th St SW, with a purple backpack and subsequently departing from the area.

COMPLAINT/BRENNAND - 13
USAO #2019R01079

42.     Investigators followed the SUBJECT VEHICLE to an office building in the Lake City area of Seattle, WA, which appeared to be some sort of community clinic. After staying in the area over an hour, the white male matching the physical description of BRENNAND left the office building at approximately 12:46 p.m. Investigators who were following the SUBJECT VEHICLE lost the track of the vehicle, but eventually re-located it outside the SUBJECT OFFICE.

43.     Later on the same day, at approximately 5:43 p.m., an investigator observed the same white male matching BRENNAND's physical description exit the building in which the SUBJECT OFFICE was located and enter the SUBJECT VEHICLE. Investigators followed the SUBJECT VEHCILE from the SUBJECT OFFICE directly to the Ballard Post Office located at 5706 17th AVE NW, Seattle, WA 98107.

44.     The investigator observed the while male parking the SUBJECT VEHICLE near the post office and exiting the car. The investigator then observed the male entering the post office and handing several parcels to an undercover USPS-OIG agent who was posing as a regular USPS employee.

45.     Specifically, the white male handed the undercover agent five parcels with pre-printed USPS shipping labels from a third-party postage vendor. One of the parcels listed the recipient name and address provided by investigators to the Subject Moniker for the December 19, 2019 undercover purchase of methamphetamine on Empire Market. The parcel had a return address of "Mustard and Co, 6123 S Pilgrim St, Seattle, WA 98188-5857."

46.     On December 23, 2019, investigators opened the parcel associated with the December 19, 2019 undercover purchase. Inside the parcel was a manila envelope with a black DVD case inside. Inside the DVD case was a dark Mylar bag which was sealed. Inside the Mylar bag was a clear sealed bag. Inside the clear sealed bag was a plastic baggie containing a crystalline substance. The plastic baggie containing a crystalline

COMPLAINT/BRENNAND - 14
USAO #2019R01079

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

substance weighed approximately 16.3 grams. The substance was field-tested positive for methamphetamine.

47. On December 27, 2019, the USPIS Seattle received the parcel associated with the December 15, 2019 undercover purchase. This parcel had been received at the undercover address in Montana that had been provided to the Subject Moniker at the time of the undercover purchase and forwarded to the USPIS Seattle by the USPIS counterpart in Montana. The parcel displayed tracking number 9405 5368 9784 6227 7369 73 with return address "ARC Document Solutions, 5211 Kensington P1 N, Seattle, WA 98103-6225."

48. On the same day, investigators opened the parcel. Inside the parcel was a manila envelope. Inside the manila envelope was a dark Mylar bag which was sealed. Inside the Mylar bag was a clear sealed bag. Inside the clear sealed bag was a plastic baggie containing a crystalline substance. The plastic baggie containing a crystalline substance weighed approximately 58.3 grams. The substance was field-tested positive for the presence of methamphetamine.

49. USPS records revealed that the parcel had been first scanned at the Ballard Post Office located in Seattle on December 18, 2019 at approximately 6:33 p.m. This is the same day on which BRENNAND was seen carrying the white envelopes and placed them inside of the trunk of the SUBJECT VEHICLE parked just outside the SUBJECT OFFICE.

50. On January 6, 2020, HSI Yakima received the parcel associated with the December 17, 2019 undercover purchase at the undercover address provided to the Subject Moniker. HSI Yakima subsequently forwarded the parcel to HSI Seattle. The parcel displayed USPS tracking number 9405 5368 9784 6231 6145 26 with return address "ARC Document Solutions, 5211 Kensington PL N, Seattle, WA 98103-6225."

51. On January 7, 2020, investigators opened the parcel. Inside the parcel was a manila envelope. Inside the manila envelope was a black DVD case with two blue strips

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970

of tape holding the DVD case closed. Inside the DVD case was a black sealed Mylar bag. Inside the Mylar bag was a clear sealed bag. Inside the clear sealed bag was a clear plastic zip lock bag that contained a crystalline substance. The substance was field tested positive for methamphetamine. The plastic zip lock bag containing a crystalline substance weighed approximately 58.06 grams.

## CONCLUSION

52.     Based on the foregoing, I respectfully submit there is probable cause to believe that TRISTAN BRENNAND has committed the offense set forth in this Complaint.

Ernest McGeachy, Complainant
Special Agent
Homeland Security Investigations

DATED this 14th day of January, 2020

HON. BRIAN A. TSUCHIDA
Chief United States Magistrate Judge

COMPLAINT/BRENNAND - 16
USAO #2019R01079

UNITED STATES ATTORNEY
700 STEWART STREET, SUITE 5220
SEATTLE, WASHINGTON 98101
(206) 553-7970